**ROBINSON BROG LEINWAND GREENE**
**GENOVESE & GLUCK P.C.**
875 Third Avenue
New York, New York 10022
Fred B. Ringel
Clement Yee
*Attorneys for the Debtor and Debtor in Possession*

<u>**Hearing Date and Time:**</u>
**May 11, 2021 at 2:00 p.m.**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X

In re:                                                           Chapter 11

**ADMIRAL PROPERTY GROUP LLC,**                Case No.:  20-42826-nhl

                                Debtor.
---------------------------------------------------------X

**OBJECTION TO APPLICATION SEEKING**
**ENTRY OF AN ORDER UNDER SECTIONS 363(a), 363(f) and 363(m)**
**OF THE BANKRUPTCY CODE AND RULES 2002, 6004 AND 9004 OF**
**THE FEDERAL RULES OF BANKRUPTCY PROCEDURE: (1) AUTHORIZING**
**DEBTOR TO SELL TO THE BEST OFFER ESTATE'S INTEREST IN THE REAL**
**PROPERTY COMMONLY KNOWN AS 157 BEACH 96TH STREET, QUEENS,**
**<u>NEW YORK AND (2) APPROVING THE MANNER AND EXTENT OF MARKETING</u>**

Robinson Brog Leinwand Greene Genovese & Gluck P.C. ("Robinson Brog"), as counsel

of record to Admiral Property Group LLC ("Debtor")[1] and as administrative creditor[2], submits

this Objection to Application Seeking Entry of an Order Under Sections 363(a), 363(f) and

363(m) of the Bankruptcy Code and Rules 2002, 6004 and 9004 of the Federal Rules of

Bankruptcy Procedure: (1) Authorizing Debtor to Sell to the Best Offer Estate's Interest in the

Real Property Commonly Known as 157 Beach 96th Street, Queens, New York and (2)

---

[1] Robinson Brog has submitted to the Court a stipulation that would substitute Robinson Brog with The Kantrow Law Group, PLLC as counsel to the Debtor. Until the stipulation is signed by the Court and Kantrow's retention is approved by the Court, Robinson Brog remains counsel to the Debtor.
[2]  Robinson Brog's claim as an administrative creditor is subject to court approval of its fee application, which will be filed after the Court approves its withdrawal from the case.

Approving the Manner and Extent of Marketing ("Motion") filed by The Kantrow Law Group, PLLC ("Kantrow"), and respectfully sets forth and alleges as follows:

1.      Robinson Brog is interested in seeing that a robust sale that maximizes value for the estate takes place. Thus, it is constrained to object to the new bid procedures ("Bid Procedures") proposed by the Debtor to govern the purported sale of its real property located at 157 Beach 96th Street, Queens, New York ("Property"). Rather than simply modifying the bid procedures already on file with the Court in order to clarify that an insider of the Debtor is eligible to be a "Qualified Bidder," the Debtor has taken drastic steps.  It has jettisoned the original bidding procedures wholesale and – without Court authorization and without regard to the detrimental consequences to the estate – purported to "terminate" the $2,150,000 stalking horse contract ("Stalking Horse Contract").  Debtor has also withdrawn the proposed chapter 11 plan that would exempt the Debtor's proposed sale from the imposition of transfer taxes and ensured distributions to creditors, all in favor of a "naked auction."

2.      The Debtor apparently expects this Court to "rubber stamp" its unexplained actions as a valid exercise of its business judgment that the Debtor thinks is essentially immune from careful scrutiny. The Debtor's unusual recent actions are not those of an earnest debtor tweaking the originally filed bid procedures in an effort to maximize value consistent with its fiduciary duties. This Debtor has already announced its strident opposition to any sale and its recent actions threaten to chill bidding and undermine the prospects of a successful sale by needlessly injecting uncertainty into the sale process.

3.      Since Debtor's actions are taken in conjunction with a pending insider transaction,[3] and they threaten harm to the interests of creditors in a case in which there is no creditors' committee to function as a watchdog, Debtor's actions should be subjected to heightened scrutiny by the Court.

4.      The Stalking Horse Contract, together with a plan and disclosure statement, were delivered to the Debtor's incoming counsel on a proverbial silver platter. But the Debtor did not simply make the modification to the originally filed bid procedures as it told parties in interest it required, an amendment to allow for insider bidding. [4] *See* Transcript of Hearing, April 27, 2021 ("Hr'g Tr.")[5] at 44:23-45:1 ("if the Court's going to go forward on the bidding procedures, then I'm going to have to amend them because the idea of precluding anybody from bidding is unacceptable"). Instead, Debtor took the perplexing step of substituting an entirely new sale motion and new bid procedures to proceed with a "naked" auction without a stalking horse bidder or plan. The Debtor's new proposed bid procedures would chill bidding by inserting both uncertainty in the sale process and making it exceedingly difficult for a robust auction that benefits creditors to take place:

(i)      The proposed bid procedures omit any form of contract, so interested parties cannot know all the terms and conditions for sale when they bid and what they agree to by bidding. The existing bid procedures were

---

[3] The $25,000 retainer paid to incoming counsel was paid by Carmine Evangelista, Peter Evangelista's father, and the expected purchaser of the secured creditor's claim in this case. This is disclosed in a "Lar-Dan" affidavit submitted with incoming counsel's retention application.

[4] The following colloquy also took place:

MR. KANTROW: Because the plan and disclosure statement and the bidding procedures specifically sought to exclude the Debtor, its principals, any related party, or any affiliate. Those are in the bid procedures proffered by Robinson Brog on behalf of the Debtor. That's why.

THE COURT: Well, why don't you make a motion to amend those?

Hr'g Tr. at 36:20-37:1(emphasis added). It is also unclear whether, because of the material changes that were made to the bid Procedures, the bid procedures, and the decision to terminate the Stalking Horse Contract need to be heard on appropriate notice rather than the eight days that are provided under the Motion. Other parties in interest should be given the time and opportunity to respond to the Motion. Additionally, Robinson Brog, a known administrative creditor, was never served with the Motion.

[5]  A copy of the 4.27.21 Hearing Transcript is attached as Exhibit A.

premised upon the fully executed stalking horse contract as a template for other bidders to mark up.

(ii)     The proposed bid procedures raise the upset price to $2,250,000 (plus transfer taxes), an amount no party in interest has ever revealed they would bid.

(iii)    The proposed bid procedures require the purchaser to pay the transfer taxes, effectively raising the upset price from $2,250,000 to $2,291,000, although state law makes the seller primarily liable for the transfer taxes. This transfer of the transfer tax obligation is highly unusual and will not be expected by bidders. The existing bid procedures called for the sale to be under a plan, exempting the transaction from transfer taxes under section 1146(a) of the Bankruptcy Code. This is the expected result in a bankruptcy sale.

(iv)    The proposed bid procedures provide for the deposit to be held in a non-interest-bearing "account." The existing bidding procedures require the deposit to be held in a <u>segregated</u> non-interest-bearing account. The stalking horse bidder's deposit is being held in Robinson Brog's IOLA escrow account.

5.      There is simply **<u>no</u>** valid business or other justification for these unexplained changes. Indeed, even without the rigorous scrutiny that these changes deserve, the Debtor does not attempt to justify its sabotaging a fully executed stalking horse contract, that was negotiated at arm's-length and backed by a twenty (20%) percent deposit, to make way for an auction that is naked and not backed by any minimum bid or deposit. A "naked" auction leaves the estate and its creditors with no protection from a bad result. If no one bids, the creditors have lost the stalking horse bid. With the estate left unprotected the secured creditor, or its assignee, could seek to dismiss the case and then take the property for no additional consideration. This is not a result that a value-maximizing fiduciary should open the door to.

6.      That the proposed bid procedures undermine the sales process is no surprise. These changes are meant to ensure there is no sale. That is consistent with Peter Evangelista's position as espoused by Mr. Kantrow at the last hearing:

> MR. KANTROW:. . . The Debtor in Possession has determined **not to go forward with the sale.** The Debtor in Possession has not been replaced by a trustee. And until and unless that happens, **the Debtor in Possession doesn't want to go forward with this**. . . .

Hr'g Tr. at 37:17-21(emphasis added)

7.     While raising the minimum opening bid by $100,000 might make it facially appear that the Debtor is seeking to increase the sales price, there is no guarantee that any party will offer $100,000 more than the $2,150,000 that the stalking horse bidder has promised to pay. Furthermore, the Motion proposes that the purchaser be required to pay all transfer/recording taxes, effectively increasing the cost to purchase the Property by at least another $41,000, while also conflicting with a buyer's expectation and New York State law, which requires the seller to pay transfer taxes. Under a confirmed chapter 11 plan, the Debtor's estate would be exempted from such taxes, and any transfer tax savings would inure to the benefit of the Debtor and its estate. These material changes to the original bid procedures essentially raise the upset price by over $140,000 beyond what was contemplated by the Stalking Horse Contract.

8.     Additionally, not providing a form of contract for the sale and not segregating a potential deposit provide further disincentives to potential bidders. Bidders are much less likely to provide a 20% deposit unless they can be assured that their money will be held in escrow and not in the operating account of the Debtor or its counsel. Not requiring a form of contract also deters bidding. A written contract provides a reliable template for comparing competing bids, which inures to the Debtor's benefit. In this regard, the proposed bid procedures provide substantial discretion to the Debtor. Here, there is no independent decision maker to determine whether the Debtor is improperly excluding potential qualified bidders from the sale or making all the other numerous discretionary decisions that typically accompany an auction process. The

proposed bid procedures do not instill confidence that such discretion will be fairly and impartially exercised.

9.      Finally, the Debtor makes no mention that by pulling the Stalking Horse Contract and the proposed plan, it risks exposing the Debtor's estate to liability for new administrative claims. Both the stalking horse bidder and Rosewood Realty Group ("Rosewood") have potential claims against the Debtor's estate if the Court permits termination of the Stalking Horse Contract and orders that a naked auction proceed despite the risks and uncertainty that the revised bid procedures would create. An unsuccessful auction would be a disaster for the Debtor's estate and all affected parties, except perhaps insiders.

10.      The Stalking Horse Contract affirmatively provides that "**<u>Seller will seek entry of a bid procedures order [], the sale order [] and any other necessary orders</u>** by the Bankruptcy Court to consummate the closing and transfer of the Property free and clear of all liens claims and encumbrances under section 363(b) and (f) of the Bankruptcy Code as soon as reasonably practical following the execution of this Agreement." Stalking Horse Contract at 18.4(a) (emphasis added).[6]  While the ultimate approval of the bid procedures and sale referenced in the contract are subject to the Court's approval, the requirement to submit the bid procedures to the Court was not. It was part of a binding obligation. *See In re* Wood, 2008 WL 2244972 at *3 (Bankr. E.D. Va. May 30, 2008) ("parties are committed to the agreement once they execute it"); *In re Frye,* 216 B.R. 166, 173-4 (Bankr. E.D. Va. 1997) (agreement to settle a claim was binding on the parties pending approval by the court.)

11.      Any alternative result would leave the parties vulnerable to foul play and could undermine the bankruptcy process. The Court in Wood described the risk as follows:

---

[6]  The Stalking Horse Contract was filed as Exhibit A to the Plan of Liquidation filed on March 26, 2021 (ECF Doc. No. 59).

Mischief can arise if a party to a contract can simply withdraw from it at any time before the court approves the agreement. The difficulty is best illustrated in the circumstances where a trustee or debtor-in-possession is actively attempting to sell estate property and has more than one interested prospective purchaser. The approval process necessarily takes time. Creditors and other parties are entitled to a reasonable time within which to review the proposed sale and make their own decision as to whether a proposed contract is in the estate's best interests. However, once the trustee or debtor-in-possession reaches an agreement, it is difficult to revive the interest of the spurned prospective purchaser. As time passes, as it must during the approval process, the ability to revive interest becomes more difficult. The disappointed prospective purchaser has moved on to other deals. If at this point the successful purchaser has the unilateral right to walk away from the deal, he has effectively eliminated his competition and may threaten to walk away unless the terms are changed more favorably to himself. In any event, the estate incurs additional costs and delays, all detrimental to the creditors.

*Wood*, 2008 WL 2244972 at *2. While here it is the seller who is reneging the same types of concerns are presented

12.     Indeed, permitting debtors who have signed stalking horse contracts, accepted good faith deposits, and filed sale motions, to turn around and abruptly renounce those contracts without giving the Court an opportunity to approve them, would undermine the integrity of the bankruptcy sale process.  It would also discourage potential stalking horse bidders from stepping forward to sign contracts and pay deposits.

13.     The *Wood* court explained that:

[t]he better resolution is to recognize that contract formation and court approval of proposed contracts are different and serve different purposes . . . The difference in bankruptcy is that the contract must ultimately be approved by the bankruptcy court because of the involvement of third parties such as creditors so that their interests are protected."  It does not, however, prevent the formation of a contract. The formation of the contract is a condition precedent to court approval. Once the contract is made, neither party can withdraw except in accordance with the agreement of the parties even though the contract has yet to be approved by the court.

*Id.* at *3.

14.     Plainly, the Debtor should have sought this Court's approval of the bid procedures as required by the Stalking Horse Contract. Debtor could have argued that the bidding procedures should have been modified for whatever reason it could explain and justify. Instead, Debtor may have breached a binding agreement to submit the bid procedures to the Court for its consideration and approval and may have exposed the estate to liability either for the $64,500 break-up fee, or for breach of contract damages. At a bare minimum, if the purported termination of the stalking Horse Contract is allowed to stand, the Debtor will likely incur additional fees to defend against such claims.[7] This claim should be protected by any escrow required by the Court.

15.     At the April 27, 2021 hearing the Court said that if the Debtor were to proceed without the Stalking Horse Contract, the Debtor would need to put funds in escrow to protect the estate and its creditors. *See* Hr'g Tr. at 21:24-25 ("If you want to go this route, then somebody needs to put in escrow that amount of money."). If the Debtor wishes to forego the sale under Stalking Horse Contract and the Court is comfortable with the changes that the Debtor seeks to introduce to the sale process, including cancellation of the sale under these circumstances, then at a minimum, the Debtor must arrange to escrow sufficient funds so that no creditors are harmed by the Debtor's unusual actions.

16.     The Debtor must deposit sufficient funds in escrow so that the affected parties are no worse off if the Debtor's scheme fails. As the Court has said, if the Debtor is seeking to run the risk of having the stalking horse walk away — and here the Debtor is attempting to chase away the stalking horse bidder, thereby exposing the estate to claims of the breach of contract —

---

[7] The Debtor's comment at the April 27th hearing that "[a] disgruntled bidder under the Second Circuit has no standing whatsoever," Hr'g Tr. at 38:5-6, reveals confusion of two different concepts. While the standing argument may apply to a losing bidder's post-sale rights, it does not apply to claims for breach of a post-petition contract that the Debtor agreed to present to the Court but did not.

and if Debtor wants to proceed to a sale that is not under a plan, money will have to put in escrow to ensure that creditors are paid. *Id.* at 26:15-17 ("before I'm going to allow 60 days to come and go, somebody's going to have to escrow the money such that these creditors are paid"). Further, without a sufficient fund in place, the chapter 11 case can also not just be dismissed. *Id.* at 26:17-19 ("[and you would have to escrow the money] anyway in a dismissal, in my view, if you have the benefit of the bankruptcy").

17.    We respectfully submit that any escrow required by the Court should cover the following amounts:

| | |
|---|---|
| Administrative Claims: | $130,000 (approx.) |
| Unsecured Distribution: | $20,000 |
| Stalking Horse Claim: | $64,500[8] |
| Rosewood Realty Claim: | $129,000[9] |
| Transfer Tax Savings: | $39,237.50[10] |
| Total Escrow: | $382,737.50 |

18.    Thus, if the Debtor seeks to pursue a naked action, which is contrary to the Court's directions and against the interests of the Debtor's estate, then the Debtor must put $382,737.50 into escrow to protect those interests that the Debtor may harm and those funds should be held in escrow pending further order of the Bankruptcy Court.

**WHEREFORE,** Robinson Brog requests that the Court approve modified bid procedures consistent with this objection, or alternatively, compel Debtor or someone acting on its behalf to

---

[8] As noted above, while the Stalking Horse Contract has not been approved by the Court, it is still a valid contract and the stalking horse may seek to pursue a claim against the Debtor's estate. For purposes of this escrow, Robinson Brog would estimate the stalking horse's claim at $64,500, which is the equivalent of the break-up fee that the stalking horse would be due if the Property were sold to another party.
[9] Rosewood, the Debtor's real estate broker, would be entitled to a $129,000 broker's commission should the Property be sold under the Stalking Horse Contract. Should termination of the Stalking Horse Contract be upheld and the naked auction hail to produce a sale, Rosewood would have lost its ability to be paid its buyer's premium.
[10] Under a plan of reorganization, any transfer tax obligation would have been exempted. Robinson Brog believes that under a Plan the Debtor would have saved $39,237.50 (or 1.825% in transfer taxes based on the $2,150,000 Stalking Horse Contract) which would be lost should the Debtor not sell the Property under a plan. These savings ultimately could be used to fund other payments.

deposit $382,737.50 into a segregated escrow which funds could not be transferred absent further order of this Court and grant any other relief that is just and proper.

**Dated:** New York, New York
May 7, 2021

**Robinson Brog Leinwand Greene**
**Genovese & Gluck P.C.**
***Counsel of Record to the Debtor***
875 Third Avenue, 9th Floor
New York, New York 10022
Tel: No.: 212-603-6300

By: /s/ Fred B. Ringel
**Fred B. Ringel**